**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

EFCO CORPORATION; EMPLOYEE
POLICY REVIEW COMMITTEE;
EMPLOYEE BENEFIT COMMITTEE;
EMPLOYEE SAFETY COMMITTEE,
Petitioners,

No. 99-1147

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent.

LPA, INCORPORATED,
Amicus Curiae.

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.

EFCO CORPORATION; EMPLOYEE
POLICY REVIEW COMMITTEE;

No. 99-1277

EMPLOYEE BENEFIT COMMITTEE;
EMPLOYEE SAFETY COMMITTEE,
Respondents.

LPA, INCORPORATED
Amicus Curiae.

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board.
(17-CA-6911)

Argued: February 28, 2000

Decided: May 17, 2000

Before LUTTIG and TRAXLER, Circuit Judges, and
G. Ross ANDERSON, Jr., United States District Judge
for the District of South Carolina,
sitting by designation.

_____

Petition for review denied and cross-application for enforcement
granted by unpublished per curiam decision.

_____

**COUNSEL**

**ARGUED:** Ransom Asbury Ellis, Jr., ELLIS, ELLIS, HAMMONS
& JOHNSON, P.C., Springfield, Missouri, for EFCO, et al. Meredith
L. Jason, NATIONAL LABOR RELATIONS BOARD, Washington,
D.C., for Board. **ON BRIEF:** Ransom A. Ellis, III, Lester J. Boyle
3d, ELLIS, ELLIS, HAMMONS & JOHNSON, P.C., Springfield,
Missouri; Michelle Voss, SCHMIDT, KIRBY & SULLIVAN, P.C.,
Springfield, Missouri, for EFCO, et al. Frederick L. Feinstein, General
Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong,
Deputy Associate General Counsel, Peter Winkler,
Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD,
Washington, D.C., for Board. Daniel V. Yager, MCGUINESS &
WILLIAMS, Washington, D.C., for Amicus Curiae.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

EFCO Corporation (EFCO) and three employee committees seek
review of the National Labor Relations Board's determination that the
employee committees are labor organizations under section 2(5) of

the National Labor Relations Act (NLRA) and that EFCO dominated, interfered with, and supported the committees in violation of section 8(a)(2) and (1) of the NLRA.[1] EFCO does not, however, challenge the decision that it is guilty of other independent section 8(a)(1) violations of the NLRA. The Board cross-petitions for enforcement of the order. Because we find substantial evidence in the record to support the Board's determination, we deny the petition for review and grant enforcement of the Board's order.

I.

EFCO is a Missouri corporation which manufactures aluminum framed window units, curtain wall systems, storefront systems, entry door systems, and automatic doors for installation in hospitals, schools, high-rise apartments, and office buildings. EFCO is incorporated in Missouri and prior to 1996 operated facilities in California, Illinois, Missouri, and Oklahoma. In 1996, EFCO expanded its business by opening production facilities in South Carolina and Virginia. Currently, EFCO employs approximately 1,250 employees in these facilities.

During the 1980s, EFCO vested principal responsibility for formulating company policy with the Management Committee, composed of company president, Chris Fuldner, and its vice presidents, where Fuldner had final authority over all decisions. After EFCO's experience with the United Brotherhood of Carpenters and Joiners of America during the 1960s and 1970s, Fuldner established programs for EFCO employees that he hoped would improve the company's pro-

_____

[1] Subject matter jurisdiction is proper in this circuit pursuant to 28 U.S.C.A. § 1331 (West 1993) since this appeal involves a federal question arising under section 10(f) of the NLRA, which provides that

> [a]ny person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any court of appeals of the United States . . . wherein such person resides or transacts business . . . by filing in such court a written petition praying that the order of the Board be modified or set aside.

29 U.S.C.A. § 160(f) (West 1998).

ductivity and his relationship with employees. Fuldner first established an employee profit-sharing plan and Employee Stock Ownership Plan. Once Fuldner discovered these programs did not fully accomplish his goals, he implemented a program called Management Resources Planning II (MRP II), which sought higher levels of efficiency through improvements in quality and inventory control, use of a "just-in-time" production system, and greater employee participation.

As part of the MRP II program, EFCO wanted employees to become more self-directed in solving day-to-day problems and more involved in company decision-making. EFCO believed the creation of employee committees would help achieve this goal. Based on this belief, during 1992 and 1993, EFCO created four committees: the Employee Safety Committee, the Employee Benefit Committee, the Employee Policy Review Committee, and the Employee Suggestion Screening Committee. The committees met on company premises during work hours and EFCO paid employee members for time spent on committee activities. EFCO provided materials and office supplies for the committee members' use. EFCO management charged these committees with various responsibilities; however, ultimate authority over benefit and policy decisions remained with EFCO management.

A. Employee Safety Committee

On April 21, 1992, company Vice President Scott Beckwith instructed Mike Washick, Plant Facilitator and Plant Safety Director, to distribute a memorandum to all employees announcing the formation of a workplace safety committee comprised of employees from the shop floor and offices. The memorandum stated that the Employee Safety Committee would be responsible for handling safety problems and establishing policies and finding ways to enforce them. The memorandum solicited volunteers for the committee but stated that EFCO did not want more than one committee member from any one department.

Washick selected the initial eleven members of the committee and organized the meeting schedule, occasionally raised topics for discussion, and presented proposals from the Employee Safety Committee to the Management Committee. Lora Saffer replaced Washick on the

Employee Safety Committee in August 1993 and assumed his role and responsibilities in organizing the committee meetings. On December 2, 1993, the Employee Safety Committee elected a coordinator that assumed Washick's and Saffer's duties on the committee.

B. Employee Benefit Committee

On September 8, 1992, Fuldner notified EFCO employees that he would create an Employee Benefit Committee for the purpose of helping "make EFCO's employee benefit plans more effective in meeting the needs of employees." J.A. 678. He wrote: "The committee will gather comments and ideas from employees about our benefit plans, contact others outside of EFCO, and make specific recommendations to EFCO's management committee." Id . The Employee Benefit Committee presented several proposals to the Management Committee, some of which were adopted, involving a long-term disability plan, medical and dental plans, an employee party, and a "Jeans Day" proposal.

EFCO Chief Financial Officer Bret Baker selected the initial committee members, including Human Resources Manager Mona Workes, and prepared an agenda for the first meeting. Until his departure in the spring of 1993, Baker attended the meetings, organized an agenda for the committee, and led discussions on various issues, including medical, dental, and disability plans and profit sharing. Workes also attended meetings and led discussions on various issues. In June 1993, EFCO Comptroller Don Kellhofer began attending meetings and acted as a liaison between the committee and Fuldner.

C. Employee Policy Review Committee

On January 15, 1993, Workes circulated a memorandum to all EFCO employees announcing the formation of the Employee Policy Review Committee. The memorandum stated, in part:"We are establishing an Employee Policy Committee to help us review and establish company policies. The committee will gather comments and ideas from employees regarding existing policies, or needs for implementation of new policies and make specific recommendations to EFCO's management committee." J.A. 577. Baker selected members for the committee, including one company supervisor. Fuldner spoke with

5

the committee at the first meeting, asked members to draft a no-smoking policy, and provided direction for a mission statement that the committee was responsible for writing. The committee worked on proposals concerning a four-day work week, job transfers, vacation time, dress code, and holidays. Baker and Workes attended some meetings and often raised issues for discussion.

D. Employee Suggestion Screening Committee

On December 28, 1992, EFCO distributed a memorandum announcing the creation of the Employee Suggestion Screening Committee. The committee administered an employee suggestion program that encouraged participation through some special recognition by the Management Committee and payment of five dollars to employees with valid suggestions for up to a maximum of five suggestions. Employee Suggestion Screening Committee members filtered out frivolous suggestions and forwarded valid suggestions to the appropriate management group. At the first meeting, attended by a senior vice president and the chief financial officer, EFCO managers set the agenda for the meeting and the committee members elected Mark Kaisar as chairman.[2] Two Management Committee members would attend each committee meeting as advisors and ensure that the committee received necessary resources.

E.

Acting on a charge filed by the United Brotherhood of Carpenters and Joiners of America, the Regional Director of the Seventeenth Region of the National Labor Relations Board issued a complaint on December 15, 1993, alleging that EFCO violated certain provisions of the NLRA. After a hearing before Administrative Law Judge George F. McInerny, he found that all four committees were labor organizations and that EFCO unlawfully dominated or interfered with each of them.

On December 31, 1998, the Board affirmed the ALJ's rulings, findings, and conclusions with minor modifications. The Board's decision

---

[2] After Kaisar subsequently became a statutory supervisor, he remained chairman of the committee.

6

found that EFCO violated section 8(a)(2) and (1) of the NLRA, 29 U.S.C.A. §§ 158(a)(2), (1) (West 1998), by establishing, dominating, interfering with, and supporting certain employee committees. The Board further found that EFCO violated section 8(a)(1) of the NLRA by engaging in other independent unfair labor practices. 29 U.S.C.A. § 158(a)(1). The Board directed EFCO to dissolve the employee committees, except the Employee Suggestion Screening Committee, to cease and desist from engaging in other independent unfair labor practices, and to post notices concerning the same.

II.

Before we can address the issues before us, we first must determine the standard of review applicable to the Board's decision and order. EFCO believes we should apply traditional deference standards, but the Board argues the more stringent Chevron standard applies. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).

Contrary to the Board's assertion in its brief,"the applicability of Chevron in this context is by no means clear." Bob Evans Farms, Inc. v. NLRB, 163 F.3d 1012, 1016 (7th Cir. 1998). Chevron governs a court's review of an agency's construction of a statute which the agency administers. Under Chevron, a court must first ask whether Congress has spoken directly to the precise question at issue because the "unambiguously expressed intent of Congress" is controlling. Chevron, 467 U.S. at 842-43. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843. The reviewing court may not substitute its own construction for a reasonable interpretation on the part of the agency. Id. at 844. Therefore, a court must defer to an agency's permissible construction of statutory terms where it acts within the rule-making or policy-formation discretion that Congress intended the agency to use in filling gaps left in a statute. Id. at 843-44.

The Board possesses both rulemaking and adjudicatory powers, see 29 U.S.C.A. §§ 156, 160 (West 1998), but"uniquely among major federal administrative agencies has chosen to promulgate virtually all of the legal rules in its field through adjudication rather than rulemak-

7

ing." Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 374 (1998). Since the Board develops general rules in the course of adjudication, there will invariably be occasions when a special degree of deference is appropriate. See Holly Farms Corp. v. NLRB, 517 U.S. 392, 398-99 (1996). Therefore, the issue we presently face is whether or not the Board adopted what amounts to a "rule" in its decision.

Section 8(a)(2) of the NLRA makes it an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it." 29 U.S.C.A. § 158(a)(2). The Board found that three of the employee committees were labor organizations and that EFCO interfered with them. A determination that the committees were labor organizations and the employer interfered with them cannot be said to involve policy choices or rulemaking in the legislative sense. In reaching this conclusion, "the Board was engaged in the classic judicial exercise of resolving competing claims under the statute, a function which does not implicate the Supreme Court's central concerns in Chevron." Bob Evans Farms, 163 F.3d at 1020. Therefore, we believe it is appropriate for us to apply traditional deference standards in reviewing the Board's decision and not the Chevron standard.

The Board's findings of fact or findings on mixed questions of law and fact are conclusive if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C.A.§ 160(e), (f); see Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951); Pirelli Cable Corp. v. NLRB, 141 F.3d 503, 514 (4th Cir. 1998). "Substantial evidence is `such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pirelli, 141 F.3d at 514 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "Put differently, we must decide whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion." Allentown Mack Sales & Serv., 522 U.S. at 366-67.

The Board's legal conclusions are reviewed to determine whether they have a reasonable basis in the law. Therefore, they will be upheld unless they are irrational or inconsistent with the National Labor Relations Act. See Beverly Enters., Virginia, Inc. v. NLRB, 165 F.3d 290, 296 (4th Cir. 1999) (citing NLRB v. Health Care & Retirement

8

Corp., 511 U.S. 571, 576 (1994)). "It is the function of the courts . . . to say what an enacted statute means." Health Care & Retirement Corp., 511 U.S. at 582.

III.

A two-step inquiry is required to determine whether an employer has violated section 8(a)(2) and (1) of the NLRA by dominating, interfering with, or supporting an employee committee. See Electro-mation, Inc. v. NLRB, 35 F.3d 1148, 1157-58 (7th Cir. 1994); cf. NLRB v. Peninsula Gen. Hosp. Med. Ctr., 36 F.3d 1262, 1268 (4th Cir. 1994) (recognizing that the court must find an employee group is a labor organization before it can find a violation of section 8(a)(2)). The first step involves examining whether the committee is a "labor organization" as defined in section 2(5) of the NLRA. 29 U.S.C.A. 152(5) (West 1998). If not, the allegation is dismissed. If the committee meets the criteria in section 2(5), the second inquiry is whether the employer has "dominated, influenced, or interfered with the formation or administration of the [committee] or contributed financial or other support to it, in violation of . . . the Act." See Elec-tromation, 35 F.3d at 1158.

A.

Section 2(5) of the NLRA defines a "labor organization" as: "[A]ny organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers con-cerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C.A.§ 152(5). EFCO concedes that employees participated in the committees and the com-mittees addressed subjects related to "working conditions," but does not believe it was "dealing with" the committees.

The Supreme Court has found that employee committees handling grievances, making proposals and requests concerning work condi-tions, and discussing proposals with management, are labor organiza-tions. See NLRB v. Cabot Carbon Co., 360 U.S. 203, 210-14 (1959). In Cabot Carbon Co., the Court found that an organization may sat-isfy the statutory requirement that it exists for the purpose in whole

9

or in part of dealing with employers even if it has not engaged in actual bargaining or included a bargaining agreement. See id. at 212-13. The concept relates to conduct much broader than collective bargaining. See id. at 211.

In Peninsula, we adopted and applied the Board's definition of "dealing with." See 36 F.3d at 1271. We recognized that "`dealing with' must be viewed as meaning a `bilateral mechanism involving proposals from the employee committee concerning the subjects listed in Sec[tion] 2(5), coupled with real or apparent consideration of those proposals by management.'" Id. (quoting Electromation, Inc., 309 N.L.R.B. 990, 995 n.21 (1992)). We noted that the Board further explained its definition by stating:

> "That `bilateral mechanism' ordinarily entails a pattern or practice in which a group of employees, over time, makes proposals to management, management responds to these proposals by acceptance or rejection by word or deed, and compromise is not required. If the evidence establishes such a pattern or practice, or that the group exists for a purpose of following such a pattern or practice, the element of dealing is present. However, if there are only isolated instances in which the group makes ad hoc proposals to management followed by a management response of acceptance or rejection by word or deed, the element of dealing is missing."

Id. (quoting E.I. Du Pont De Nemours & Co., 311 N.L.R.B. 893, 894 (1993)). We summarized the bilateral mechanism analysis as follows:

> (1) while the term "dealing with" connotes activity which is broader than collective bargaining, an employer does not necessarily "deal with" its employees merely by communicating with them, even if the matters addressed concern working conditions; (2) "dealing" occurs only if there is a "pattern or practice" over time of employee proposals concerning working conditions, coupled with management consideration thereof; (3) isolated instances of the conduct described in number two do not constitute "dealing;" and (4) management may, in certain circumstances, gather information from employees about working conditions and may

10

even act on that information without necessarily "dealing with" them.

Id. at 1271-72. We find there is substantial evidence in the record to support the Board's finding that a pattern or practice, and not isolated instances, existed where the employee committees submitted proposals to EFCO management for consideration and they then would reject, accept, or modify the proposals. Therefore, after a review of the record, we find substantial evidence supports the Board's finding that the employee committees were labor organizations.

B.

Next, we must proceed to the second step in our analysis to determine if EFCO dominated, interfered with, or supported the committees. When an employer controls the formation and structure of a labor organization, it "dominates" that organization, thereby depriving the employees of the complete freedom to engage in self-organization guaranteed them by the NLRA. See NLRB v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 249 (1939). A labor organization that is the creation of the employer, whose structure and function are essentially determined by the employer, and whose continued existence depends on the fiat of the employer, is one whose formation or administration has been dominated under section 8(a)(2). See Electromation, 35 F.3d at 1169-70. Support from the employer by way of paying the employees for their time spent working with the committee, providing office space for meetings, and furnishing supplies for the committee's activities will not violate section 8(a)(2) standing alone. But considering the totality of the circumstances, such conduct can evince efforts of the employer to dominate the employee committees. After a review of the record, we find substantial evidence supports the Board's finding that EFCO unlawfully dominated, interfered with, and supported the employee committees.

CONCLUSION

Based on our thorough review of the record as a whole and the controlling legal principles, we conclude that there is substantial evidence to support the Board's determination that the employee committees were labor organizations and that EFCO interfered with the

11

committees within the meaning of section 8(2) and (1) of the NLRA. For the reasons stated herein, we deny the petition for review of the Board's decision and order, and grant the Board's cross-petition for enforcement of its order.

PETITION FOR REVIEW DENIED AND CROSS-PETITION FOR ENFORCEMENT GRANTED

12