**LOCOMOTIVE FINISHED MATERIAL CO. v. NATIONAL LABOR RELATIONS BOARD.**

**MACHINE SHOP EMPLOYEES' ASS'N OF ATCHISON, KAN., v. SAME.**

**Nos. 2847, 2905.**

Circuit Court of Appeals, Tenth Circuit.

May 15, 1944.

R. A. Brown, Jr., of St. Joseph, Mo. (Brown, Douglas & Brown, of St. Joseph, Mo., on the brief), for Locomotive Finished Material Co.

Maurice P. O'Keefe, of Atchison, Kan. (O'Keefe & Root, of Atchison, Kan., on the brief), for Machine Shop Employees' Ass'n of Atchison, Kan.

Howard Lichtenstein, Asst. Gen. Counsel, National Labor Relations Board, of Washington, D. C. (Alvin J. Rockwell, Gen. Counsel, of Washington, D. C., and Owsley Vose and Mozart G. Ratner, Attys., National Labor Relations Board, both of Washington, D. C., on the brief), for respondent.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

These are petitions of The Locomotive Finished Material Company[1] and Machine Shop Employees' Association of Atchison, Kansas, to review an order of the National Labor Relations Board.[2]

On April 14, 1934, a labor organization was formed by certain employees of the company under the name Machine Shop Employees' Association of The Locomotive Finished Material Company.[3] It continued in existence until January 3, 1943.

In November, 1942, the International Association of Machinists and the International Moulders & Foundry Workers Union of North America, Local No. 418,[4] both affiliated with the American Federa-

---

[1] Hereinafter called the company.

[2] Hereinafter called the Board.

[3] Hereinafter called the Association.

[4] They will be referred to herein as the Machinists Union and the Moulders Union, respectively, and collectively as the Unions.

tion of Labor, began campaigns to organize the company's employees.

█ The Board found that during such campaigns a number of anti-union statements were made by the production manager and certain foremen of the company that were imputable to the company. The evidence respecting these statements is not altogether satisfactory, but the credibility of the witnesses and the weight of the evidence are questions for the Board, not for this court,[5] and we cannot say the findings are not supported by substantial evidence.

Moreover, there was evidence that an employee of the company during working hours and on company property, with the knowledge and approval of his foreman, sought to induce employees to revoke their membership in the Unions. This is contrasted with orders given by another foreman that efforts to obtain members in the Union should not be carried on during working hours.

█ On November 21, 1942, the Unions presented claims to the company that they represented a majority of the employees in their respective bargaining units and requested recognition. The company denied the requests for recognition on the ground that it had no way of determining whether they respectively represented majorities, and suggested that the issue be decided by consent elections conducted by the Board. On or about December 8, 1942, representatives of the Unions and representatives of the company agreed that consent elections should be held. The company demanded that the Association be placed on the ballot with the Machinists Union. The agents of the Board investigated the Association and found that it was an existing labor organization and that it should be placed on the ballot with the Machinists Union.[6] The Association signed the agreement for a consent election. The elections were held on December 21, 1942. The result of one election was 135 votes for the Moulders Union and 185 votes against it. The result of the other election was 70 votes for the Machinists Union and 173 votes for the Association.

During the week preceding the elections, the company's superintendent, Moorhead, called to his office the bargaining agents of the Association, known as the Employees' Representative Group, and advised them that the company proposed to grant the Association's request for a wage increase and had applied to the War Labor Board for approval thereof.

Shortly after the elections, the Unions, filed with the Board's Regional Director objections to the elections and charges that the company had dominated and interfered with the administration of and contributed to the support of the Association. Thereafter, and on January 3, 1943, the Association held a meeting, at which the constitution and the by-laws of the Association were suspended, and a committee was appointed to act as trustees for the Association until two weeks after the Board had ruled on the objections to the elections.

On January 21, 1943, the Regional Director sustained the charges and voided the elections.

On February 7, 1943, a meeting was held by certain of the machine shop employees at which it was decided to create a new organization to replace the Association and a committee was created to draft a new constitution and by-laws. On February 21, 1943, a further meeting of the employees was held, at which the proposed constitution of the new organization was adopted. The name of the new organization was Machine Shop Employees' Association of Atchison, Kansas.[7]

It is true that many objectionable features of the Association's constitution were not embraced in the constitution of Independent, but in many respects the constitution and organization of Independent followed the pattern of the Association. Funds in the treasury of the Association were transferred to Independent and employees who had been members of the Association, on joining Independent, were credited on the initiation fee in Independent with the amount of initiation fee they had paid in the Association. Thus, it will be seen that Independent had its roots in and stemmed from the Association. Notwithstanding the Association did not accord with legal requirements for a labor organization, the company never repudiated it. On the con-

---

5 Utah Copper Co. v. National Labor Relations Board, 10 Cir., 139 F.2d 788, 790; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 597, 61 S. Ct. 358, 85 L.Ed. 368.

6 The Board is not estopped by that finding. Utah Copper Co. v. National Labor Relations Board, 10 Cir., 139 F. 2d 788, 791.

7 Hereinafter called Independent.

trary, over a long period of time, it recognized the Association and dealt with it as the bargaining agent of its machine shop employees. Pursuant to Independent's request, the company on March 15, 1943, recognized Independent as exclusive bargaining agent for the machine shop employees. Independent furnished the company no proof of its majority status and recognition was granted upon the basis of a showing of a majority made by the Association in its election in December.

The Board found that the company dominated and interfered with the administration of and contributed support to the Association and Independent, and that by making anti-union statements to its employees interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in § 7 and thereby violated §§ 8(1) and 8(2) of the National Labor Relations Act, 29 U.S.C.A. §§ 157, 158(1, 2). It ordered the company to cease and desist from its unfair labor practices, to withhold recognition from the Association, to withhold recognition from and completely disestablish Independent as the bargaining representative of any of its employees, and to post appropriate notices.

■ The finding of the Board with respect to the Association is clearly supported by substantial evidence. It may be doubted that the evidence justifies the finding that the company directly dominated and interfered with the administration of and contributed support to Independent. Nevertheless, we are of the opinion that the Board was warranted in ordering the disestablishment of Independent as a bargaining agent. While employees are free to adopt any form of organization and representation, whether purely local or connected with a national body, their purpose so to do may be hindered by the existence and recognition by the employer of an old plan or organization, the original structure or operation of which did not accord with legal requirements.[8] Even where the new organization is a distinct entity from the old, where there is no clear line of cleavage between the old and the new, and the latter has its roots in and stems from the former, the disestablishment of the new may be necessary to wipe the slate clean and give the employees untrammelled freedom in the creation of their bargaining unit.[9] In National Labor Relations Board v. Moore-Lowry Flour Mills Co., 10 Cir., 122 F.2d 419, 424, we said:

"But the slate must be wiped clean by the complete abandonment of the old and a bona fide, separate and distinct beginning of the new."

Action by the Board under § 10 of the Act, 29 U.S.C.A. § 160, is limited to the effectuation of the policies of the Act. One of these is that the employees shall be free to choose such form of organization as they wish.[10] We cannot say, on this record, that the Board erred in holding that disestablishment of Independent was necessary to accord the employees untrammelled freedom in the creation of their bargaining agent.

■ On April 27, 1943, the company filed a motion to make the amended complaint of the Board more definite and certain. The trial examiner sustained the motion in part and denied it in part. After ruling on the motion, the examiner announced

"* * * as to any testimony elicited concerning which the respondent [company] is surprised or feels that it needs time in order to meet such testimony, * * * I will grant the right to the respondent [company] to recall witnesses for further cross-examination and upon application will grant an adjournment for a reasonable time."

Counsel for the company made no request for adjournment or further right of cross-examination. The trial was conducted at intervals and the company was afforded full opportunity to cross-examine the witnesses and to meet the evidence adduced by the

[8] Colorado Fuel & Iron Corp. v. National Labor Relations Board, 10 Cir., 121 F.2d 165, 174; National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 250, 60 S.Ct. 203, 84 L.Ed. 219.

[9] National Labor Relations Board v. Southern Bell T. & T. Co., 319 U.S. 50, 56, 57, 63 S.Ct. 905, 87 L.Ed. 1250; Colorado Fuel & Iron Corp. v. National Labor Relations Board, 10 Cir., 121 F. 2d 165, 174; National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 58 S.Ct. 571, 82 L. Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 250, 60 S.Ct. 203, 84 L.Ed. 219.

[10] National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 250, 60 S.Ct. 203, 84 L.Ed. 219; Colorado Fuel & Iron Corp. v. National Labor Relations Board, 10 Cir., 121 F.2d 165, 174.

Board. We think it was not prejudiced from lack of definiteness in the allegations of the complaint.[11]

The order will be enforced.

---

[11] Cf. Swift & Co. v. National Labor Relations Board, 10 Cir., 106 F.2d 87, 91; Consumers Power Co. v. National Labor Relations Board, 6 Cir., 113 F.2d 38, 42, 43; National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 873.